GEORGE W. HAVICE, Defendant in Error, *vs.* ABRAM
HAVICE, Plaintiff in Error.

*Opinion filed February 20, 1913.*

1. DEEDS—*the title cannot be divested by destroying the deed.*
If a deed has been executed and delivered the title passes and does
not become re-invested in the grantor by the burning or other de-
struction of the deed.

2. SAME—*when decree in proceeding to establish lost deed will
not be disturbed.* A decree requiring the defendant to execute a
deed to complainant upon the theory that the defendant had once
executed and delivered a deed to the property to the defendant but
had subsequently obtained possession of the deed and destroyed it
will not be disturbed on writ of error, where the evidence, though
in irreconcilable conflict, does not preponderate against the decree.

3. LACHES—*when the doctrine of laches does not apply.* Fail-
ure of the complainant to file a bill to establish a lost deed for
some fourteen years after its alleged execution and delivery does
not constitute *laches,* where there is evidence fairly tending to
show the complainant did not know the deed had been destroyed
until within about a year before the bill was filed.

WRIT OF ERROR to the Circuit Court of Champaign
county; the Hon. SOLON PHILBRICK, Judge, presiding.

JOHN J. REA, for plaintiff in error.

RAY, DOBBINS & DOBBINS, for defendant in error.

Mr. JUSTICE CARTER delivered the opinion of the court:

Defendant in error filed a bill in the circuit court of
Champaign county to establish a lost deed to sixteen acres
of land in said county, alleging that said deed was executed
by plaintiff in error and his wife, subject to a life estate in
favor of the grantors, and delivered to him in 1897. The
answer of plaintiff in error denied the execution of such a
deed. The master in chancery to whom the matter was re-
ferred reported, recommending that the plaintiff in error be
directed to execute a deed to defendant in error subject to

a life estate in plaintiff in error, or upon his default that a commissioner or the master be authorized to make the deed. The trial court approved the master's report and entered a decree accordingly. To review that decree this writ of error was sued out.

Previous to 1894 the plaintiff in error occupied a tract of land which consisted of thirty-seven or forty acres, of which this sixteen-acre tract was a part, as a homestead for himself and wife. Defendant in error, who is the son of plaintiff in error, was then about twenty years of age, unmarried, and resided with his parents at their home, working the farm for them. About 1894 the plaintiff in error traded this farm for eighty acres in Kansas and moved there but after a few months he returned to Champaign county. Shortly after his return he re-purchased this sixteen-acre tract. The testimony as to how it was re-purchased, who furnished the money, and other details, is very conflicting. Defendant in error testified that his father, upon returning from Kansas, was in such poor financial circumstances that the witness and an uncle loaned him money to get back; that witness told his father he would let him have the money to buy back part of the old homestead if he would deed it to witness; that the property was accordingly purchased in plaintiff in error's name for $920, $420 being paid in cash and $500 being raised by mortgage on the sixteen acres, and that witness afterward paid off the mortgage with money earned at farm labor; that in 1897 plaintiff in error and his wife made a deed to defendant in error in the village of Fisher, where the three went for that purpose. He is corroborated as to the making of the deed by the testimony of a notary public, Sturgeon, and a lawyer, Harry Kelly. According to the testimony of these three, Mr. and Mrs. Havice, with the son, went to Sturgeon's office to ask him to draw the deed. He had just received his commission as notary, and asked Kelly, whose office was in the same suite, for advice. Kelly advised that a deed be

executed by the father and mother to the son, the grantors reserving a life estate. The deed was then read over to Mr. and Mrs. Havice and they executed and acknowledged it before the notary public, Sturgeon. Neither Sturgeon nor Kelly recalled whether the deed was delivered at that time. The son testified that it was delivered to him in that office by both his father and his mother; that he took it and locked it in a trunk in his room without recording, where it remained about two years; that he then went to Kansas, and on his return found the trunk broken open and the deed missing; that he searched for the deed but has never found it; that some time later he asked his father about it, and his father said, "It's all right;" that he said nothing further about the matter until about a year previous to the commencement of these proceedings, when his father stated that he had burned the deed. Defendant in error further testified that he let his father have $150 previous to this loan when the sixteen-acre tract was re-purchased and as a separate transaction, and had taken a note for the $150; that they had had a settlement of all outside accounts, other than as to the sixteen acres, about a year previous to this trial and the note for $150 was included in the settlement at that time, but that his father refused to make a new deed for the sixteen acres.

The plaintiff in error testified that he bought the sixteen acres from Frank Vennum and paid $900 therefor; that he paid about $400 in cash and secured the balance by mortgage on the tract so purchased; that he had some cash of his own at that time and borrowed $150 of the defendant in error, for which latter amount he gave his note, this note being taken up in the settlement made with his son, heretofore referred to; that the $500 mortgage, after being extended once for five years, was paid off by himself with money raised by selling a house and some lots in Fisher; that the defendant in error did not loan him any money to pay on this property except said $150; that he

was not out of money when he returned from Kansas. Plaintiff in error admitted that there was a paper drawn up which he intended to be and understood was a contract, two or three years after his return from Kansas; that it provided that the son, if he paid off the $500 mortgage and also took care of the plaintiff in error and his wife during their lives, was to have the sixteen acres; that the son did not pay off the mortgage. Plaintiff in error's testimony on the question of the deed and contract is not clear or consistent. He sometimes speaks of a contract and sometimes of a deed. He did not remember clearly who drew the paper; thought a different man drew it from lawyer Kelly, but said he might be mistaken; contended that the son was not present when it was drawn, but did not remember whether he signed the contract; could not tell who signed it; testified that he gave this paper to his wife to put in a little box and did not remember of ever seeing it again; that he did not give it to the defendant in error or consent to its being given him.

It appears from the testimony that a bastardy charge was made against defendant in error about two years after the sixteen-acre farm was re-purchased, which was settled by the defendant in error paying a certain amount, part of which was in notes aggregating $250. These notes were offered in evidence and refer to the makers in the plural number, but the name of the maker or makers was torn off. Defendant in error testified that he signed the notes and paid them, tearing off the signature at that time. The plaintiff in error testified that he signed as surety on the notes and had to pay $220 of the amount.

Two witnesses testified that plaintiff in error and his wife had said in their presence, after the sixteen-acre tract had been re-purchased, that it belonged to defendant in error and he was to have it at their death. A woman named Lizzie Ward, who worked for the old people, testified that

she heard the plaintiff in error say to his wife, "Mother, George has a deed to this place, hasn't he?"

Seven witnesses testified on behalf of plaintiff in error as to circumstances connected with the purchase and mortgaging of said sixteen acres and the sale of the house and lots in Fisher, and stated that they knew nothing about defendant in error having anything to do with these transactions. A sister-in-law of defendant in error also testified to having read a letter from him to his mother in which he requested her to burn a paper between himself and his folks, because he was liable to have trouble on account of the bastardy charge. She further testified that the mother got the paper and she (the witness) burned it. Her husband corroborated her as to this testimony.

Several witnesses for plaintiff in error testified that defendant in error only farmed on a small scale and never accumulated much money, while defendant in error testified to having considerable sums at various times, in which he is corroborated by two or three witnesses.

The testimony, as we have stated, is not at all in harmony and cannot be reconciled. The testimony of plaintiff in error is not reasonable and consistent in many of its parts, and neither is that of defendant in error. The record indicates that there has been considerable feeling between the various children of plaintiff in error; that the brothers and sisters of defendant in error and their families criticised him very sharply on account of the bastardy charge. The record shows that he afterward married the girl who brought the charge against him, and they had lived together as man and wife up to the time of this hearing and had six children. It is apparent from this record that defendant in error assisted his parents from the time they went to Kansas and returned, up to the time of this trouble, more than any of his brothers and sisters. While the evidence on many points is in hopeless conflict, we think it is clear that some time in 1897 plaintiff in error and his wife

executed a deed to defendant in error for the sixteen acres, reserving a life estate, the deed being drawn up by Kelly and acknowledged before Sturgeon. As a matter of fact, there is no testimony directly contradictory of that of the lawyer and the notary public on this question, the old gentleman himself conceding that he signed some. paper. He denies, however, that he delivered it. Defendant in error testified that it was delivered to him, and in this he is corroborated, directly or indirectly, as we have stated, by three witnesses, who swore they heard the old people say that the property, after their death, belonged to George. The testimony of defendant in error's sister-in-law and her husband with reference to the burning of the paper by the mother, if admissible, would tend to corroborate the fact that the deed was delivered. It is clear that if there was a delivery the title would not be put back in plaintiff in error by burning the deed.

Counsel for plaintiff in error further contends that this suit is barred by *laches.* The deed, according to the testimony, was executed in 1897. These proceedings were begun in 1911. We are disposed to hold that the evidence tends to corroborate defendant in error's claim that he did not know that the deed was destroyed until within about a year before the bill was filed. It is contended by defendant in error that the doctrine of *laches,* under the rule laid down by this court in *Schroeder* v. *Bozarth,* 224 Ill. 310, *Henderson* v. *Kibbie,* 211 id. 556, and *Borders* v. *Hodges,* 154 id. 498, cannot apply to remainder-men during the intermediate estate. While we are of the opinion that this rule does not apply to the facts in this case, we are disposed to hold that the proof does not show *laches* on the part of the defendant in error.

Taking all the evidence in the record we are of the opinion that it sustained the findings of the trial court, and the decree of that court will therefore be affirmed.

*Decree affirmed.*